IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM ANSELL,

        Plaintiff,                            09cv1398

                                                **ELECTRONICALLY FILED**

   v.

ROSS TOWNSHIP, ET AL.,

        Defendants.


**MEMORANDUM OPINION RE: DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT (DOC. NOS. 66, 68, 70 & 74)**

**I.      Introduction**

      This matter comes before the Court on four separate motions for summary judgment filed

by the Defendants pursuant to Federal Rule of Civil Procedure 56.  Doc. Nos. 66, 68, 70 & 74.

For the reasons that follow, three of the motions (Doc. Nos. 66, 70 & 74) will be granted, and the

remaining motion (Doc. No. 68) will be granted in part and denied in part.

**II.     Background**

      Plaintiff William Ansell ("Ansell") is a fifty-seven-year-old male.[1]  Doc. No. 80-28, 3.

Ansell married Nancy Ansell ("Nancy") in October 1976.  Doc. No. 94, ¶ 127.  The Ansells

maintained their residence in New Castle, Pennsylvania.  *Id.*, ¶ 128.  Their two daughters,

Valerie Ansell ("Valerie") and Julia Ansell ("Julia"), were born in 1978 and 1980, respectively.

*Id.*, ¶ 129.

      Ansell and Nancy separated in 1983 and divorced in 1985.  *Id.*, ¶ 127; Doc. No. 77-9, 5.

Ansell continued to reside in New Castle in the immediate aftermath of the divorce.  Doc. No.

94, ¶ 128.  At some point between 1983 and 1985, the Court of Common Pleas of Lawrence

---

[1] The documentary record indicates that Ansell was born on January 31, 1955.  Doc. No. 80-28, 3.

County ordered Ansell to provide Nancy with child-support payments. *Id.*, ¶ 153; Doc. No. 77-9, 3. Ansell was initially allowed to see Valerie and Julia during the first three weekends of each month. Doc. No. 77-9, 5. Nancy later accused Ansell of molesting their daughters. *Id.*, 3, 5. Ansell's visitation rights were terminated as a result of Nancy's allegations. *Id.*, 3. Due to the termination of his visitation rights, Ansell decided not to make child-support payments to Nancy. Doc. No. 94, ¶¶ 152-154.

In 1987, Ansell moved to a residence owned by his brother, Robert Ansell ("Robert"). Doc. No. 94, ¶¶ 123-124. The residence is located at 109 Fairley Road in Ross Township, Pennsylvania. *Id.*, ¶¶ 1, 123. After moving into the residence, Ansell periodically visited his sister, Joann, who resided in Golden, Colorado. *Id.*, ¶ 126. He did not see Valerie or Julia between 1987 and 1996. *Id.*, ¶ 130.

Between 1995 and 2006, Ansell was arrested at least four times for failing to pay child support or failing to appear at contempt hearings. *Id.*, ¶¶ 156-159. Although Ansell made some payments to Nancy in order to "purge himself from contempt," he did not make the monthly payments that he was required to make pursuant to the terms of the applicable court orders. *Id.*, ¶ 155. In January 2006, Ansell spent four days in jail for failing to keep his payments current. *Id.*, ¶ 159.

On July 23, 2007, the Court of Common Pleas of Allegheny County issued a warrant for Ansell's arrest. Doc. No. 80-28, 1-2. The warrant was issued because Ansell had failed to appear for a scheduled compliance hearing. *Id.* The Allegheny County Sheriff's Department ("Sheriff's Department") decided to execute the warrant on the morning of October 18, 2007. Doc. No. 94, ¶ 72. Ross Township police officers Michael Orsino ("Orsino"), James Fitch

("Fitch") and David Sciullo ("Sciullo") were sent to Ansell's residence to assist the Sheriff's deputies in their efforts to execute the warrant. *Id.*, ¶¶ 72, 234.

Orsino and Sciullo knocked on Ansell's door and announced their presence. *Id.*, ¶ 74. Ansell allegedly did not hear the officers because of a hearing impairment. *Id.* Orsino and two Sheriff's deputies, Vincent Longo ("Longo") and Ronald Stokes ("Stokes"), entered the residence through a garage. *Id.*, ¶¶ 75, 272. They apparently opened the garage door by using a remote control device that Longo had retrieved from Ansell's car. *Id.*, ¶¶ 267, 268. After entering the residence, the deputies observed that Ansell possessed hunting equipment and shotgun shells. *Id.*, ¶ 269. Ansell was lying in bed on his back. *Id.*, ¶¶ 167, 188. He heard someone scream, "Warrant search!" *Id.*, ¶ 166. After hearing the sound of the approaching law enforcement officials, Ansell sat up in his bed. *Id.*, ¶ 168. A .38 charter arms revolver was hanging from Ansell's left bedpost in a brown leather holster. *Id.*, ¶¶ 169-170. A box of shells was located inside of a nearby nightstand. *Id.*, ¶ 79. Orsino and the deputies found Ansell in his bedroom. *Id.*, ¶ 76. Ansell was pulled onto the floor by his leg. *Id.*, ¶ 176. While the deputies attempted to take Ansell into custody, Orsino observed the revolver hanging from Ansell's bedpost. *Id.*, ¶ 77. As Ansell was being placed under arrest, Orsino searched the dresser and nightstand located inside of the bedroom.[2] *Id.*, ¶¶ 81-82. The deputies took Ansell out of the bedroom and held him in an adjacent corner.[3] *Id.*, ¶ 85. At that point, Ansell had not yet been placed in handcuffs. *Id.*, ¶ 187.

Ansell was taken from the corner and seated in a chair next to his kitchen table. *Id.*, ¶ 186. He was subsequently placed in handcuffs. *Id.*, ¶ 192. Detective Martin George ("George")

---

[2] There is a factual dispute as to whether Orsino physically secured the revolver during the course of the arrest. Doc. No. 94, ¶ 80.

[3] There is a factual dispute as to whether the deputies "escorted" or "dragged" Ansell out of the bedroom. Doc. No. 94, ¶ 85.

entered the residence shortly after learning that Ansell had been taken into custody.  *Id.*, ¶ 281.

Although Ansell asked to be provided with his dentures, the deputies denied that request.  *Id.*, ¶

189.  The deputies gave Ansell pairs of his shoes and socks while he was seated in the kitchen.

*Id.*, ¶ 191.  They later escorted him out of the residence and into a police car.  *Id.*, ¶ 193.

Ansell's feet were shackled before he was placed inside of the police car.  *Id.*, ¶ 194.  George

temporarily removed the handcuffs so that Ansell could put on a shirt.  *Id.*, ¶ 195.

George proceeded to drive Ansell into downtown Pittsburgh.  *Id.*, ¶¶ 197-198.  The police

car arrived at Mellon Arena at approximately 8:00 A.M.  *Id.*, ¶ 200.  George stopped the car at

Mellon Arena, spoke with several people standing nearby, and made a quick call on his cellular

telephone.  *Id.*, ¶ 198.  Although the warrant specified that Ansell was to be delivered "into the

custody of the Court of Common Pleas," it also contained language directing that he be held at

the Allegheny County Jail ("County Jail") until that court was open for business in the event that

he was taken into custody at a time when the court was "unavailable."  Doc. No. 80-28, 1-2.

Since the Court of Common Pleas had not yet opened for business, George transported Ansell to

the County Jail.  Doc. No. 94, ¶ 289.

After arriving at the County Jail, Ansell was taken to a stall located in the "intake" area.

*Id.*, ¶ 330.  He was instructed to completely disrobe[4] in the presence of a male corrections

officer.  Doc. No. 77-11, 6.  His clothes were confiscated, and a "red jump suit" was given to

him.  *Id.*, 5.  He was not touched by the corrections officer during this encounter.  Doc. No. 94, ¶

340.  The County Jail maintained a policy prohibiting the acceptance of any individual who was

in need of immediate medical attention.  *Id.*, ¶ 294.  After changing into the standard prison

attire, Ansell was examined by a nurse and medically cleared to enter the prison population.

---

[4] The parties disagree as to whether Ansell's compelled disrobing constituted a "visual body inspection" or a "strip search."  Doc. No. 94, ¶ 329.

Doc. No. 77-11, 5; Doc. No. 94, ¶¶ 292-295. Ansell was required to undress and shower in the presence of a male corrections officer after undergoing the medical examination. Doc. No. 77-11, 8; Doc. No. 94, ¶¶ 341-342.

In an order dated October 19, 2007, the Court of Common Pleas of Allegheny County stated that Ansell and his attorney had appeared for a hearing[5] regarding the bench warrant, that he remained in contempt of the prior orders requiring him to make child-support payments, and that he was required to make monthly payments to bring himself into compliance with those orders. Doc. No. 80-26, 23. The bench warrant was dismissed in a separate order issued that same day. *Id.*, 24. Ansell was released later that evening.[6] Doc. No. 94, ¶ 328.

On November 15, 2007, Ansell contacted the Ross Township Police Department ("RTPD") and complained that employees of the Public Works Department had blown leaves into his yard. Doc. No. 94, ¶ 36. Officer Richard D. White ("White") responded to the call. *Id.* After arriving at the scene, White spoke with Peter Castellano ("Castellano"), who was the Director of Public Works. *Id.*, ¶ 37. Ansell was unable to hear the verbal exchange between White and Castellano. *Id.*, ¶ 38. White left Ansell's residence without issuing a citation. *Id.*, ¶ 39.

Ross Township's Board of Commissioners ("Board") conducted meetings on August 11, 2008, August 25, 2008, and September 8, 2008. Doc. No. 14, ¶¶ 38-39. At each of these meetings, Ansell claimed that members of the RTPD and the Department of Public Works ("DPW") had subjected him to unfair treatment. *Id.* On October 9, 2008, Ansell and his neighbor, Randi Grubb ("Randi"), each contacted law enforcement authorities and reported that the other was illegally using a vehicle to block Fairley Road. Doc. No. 94, ¶ 40. Officer

---

[5] Ansell denies that he and his attorney appeared for a hearing on October 19, 2007. Doc. No. 94, ¶ 324.

[6] The precise time of Ansell's release is disputed by the parties. Doc. No. 94, ¶ 328.

Gregory Glenn Garcia ("Garcia") responded to the calls. *Id.*, ¶ 41. After speaking with Ansell, Randi, and another resident of Fairley Road, Garcia cited Ansell for driving on the wrong side of a roadway.[7] Doc. No. 14-1, 2. Ansell was ultimately acquitted of the charge.[8] Doc. No. 14-2, 4.

On October 31, 2008, Randi's husband, Vince Grubb ("Vince"), contacted the RTPD and reported that Ansell had blown leaves into the street. Doc. No. 94, ¶ 43. Officer Peter M. Chuberko ("Chuberko") responded to the call and reported to Fairley Road. *Id.* He ultimately left the scene without making an arrest or issuing a citation. *Id.*, ¶ 45. In a police report dated November 3, 2008, Chuberko stated as follows:

> Mr. Grubbs called to report that Mr. Ansell is blowing leaves from his yard onto Fairley Rd. Mr. Grubbs that [sic] two other neighbors witnesses [sic] this as well. Grubbs also stated that he had pictures of Mr. Ansell blowing the leaves onto the street. There was a large amount of leaves around the perimeter of Ansell's property and Ansell's yard was fairly clear of fallen leaves. Due to the ongoing problems, I had patrolled through the area approximately two hours earlier and there was a considerable amount of fallen leaves in Ansell's yard which now appeared to be pushed to the street. I spoke to Bill Ansell's brother, Robert E. Ansell, [sic] he wanted to know why I was in the area. I explained that I received a call about Bill Ansell blowing leaves from his yard onto Fairley Rd. Robert said that he was not doing this but that the Township DPW blew the leaves into his yard. I spoke to DPW supervisor Jim Stack. Stack said that to his knowledge no [sic] of his men were on Fairley Rd. on this date. He also said that the [sic] do not make it a practice of blowing leaves from the street on to resident's [sic] property. Bill Ansell stormed out of the house and began calling the Ross Township police corrupt and that we take sides and that we are all against him. He called us "a bunch of sonsabitches, and fucking assholes." He continued to yell and carry on in a tumultuous manner. I advised Bill Ansell to cease and desist his behavior [sic] otherwise I would arrest him for disorderly conduct.

Doc. No. 78-14. The incident was characterized in the report as an alleged "road hazard." *Id.*

Ansell, an electrician, typically erects an elaborate light-up display at his residence during the Christmas season. The display apparently attracts a large number of individuals to Fairley

---

[7] 75 PA. CONS. STAT. § 3301.

[8] The record indicates that Ansell was acquitted of the charge on April 7, 2009, during a trial conducted in the Court of Common Pleas of Allegheny County before Judge Robert C. Gallo. Doc. No. 14-2, 4.

Road, making it difficult for his neighbors to enter and exit their property. *The Pittsburgh Channel* reported on December 16, 2008, that Ansell had displayed the words "Fuck Ross Township"[9] on a sign appearing within the display. Doc. No. 14-4, 2. The report stated that one of Ansell's neighbors had seen the sign and "painted over the profanity." *Id.* Two days later, the *Pittsburgh Post-Gazette* reported that Ansell had turned his Christmas lights on after leaving them off for four days. Doc. No. 14-5, 2-3. During an interview conducted in connection with the story, Ansell denied that he had displayed a "profanity-laced sign." *Id.*, 3. He accused Ross Township of trying to "punish" him for tying up traffic on Fairly Road. *Id.* Randi, who was also interviewed, complained that visitors attempting to observe the display had made it difficult for her to enter and exit her driveway. *Id.* Randi further stated that while she had considered moving, she believed that Ansell's Christmas display would make it difficult for her to sell her house at face value. *Id.* On December 22, 2008, the Board passed Ordinance No. 2275, which prohibited motorists from parking between homes located within a specified portion of Fairley Road. Doc. No. 14, ¶ 41(c).

Randi contacted the RTPD on January 3, 2009, and reported that her son had seen Robert standing on her property. Doc. No. 94, ¶ 48. Chuberko and Officer Albert Hribik ("Hribik") proceeded to Fairley Road after receiving the report. *Id.* No citations were issued. *Id.*, ¶ 49. In a police report describing the encounter, Chuberko made the following statements:

> Mrs. Randi Grubb called the police to report that her 12 year old son observed Bob Ansell at the edge of their driveway. I asked Mr. Ansell if he was on the Grubbs [sic] property and he said no. He was in the area that looks like their driveway but he claims that their driveway is actually part of the street according to his survey map. I advised him to seek assistance from the township regarding a property dispute because he was not a licensed or certified land surveyor. I also relayed to him that Mrs. Grubb did not want he or his brother, Bill, on her

---

[9] Although the online version of the story used the phrase "expletive Ross Township," the filings of the parties suggest that the phrase "Fuck Ross Township" had been displayed on the sign. Doc. No. 14-14, 2; Doc. No. 94, ¶ 50.

property. While speaking to Bob Ansell, his brother Bill kept going in and out of the house and kept repeating to Sgt. Hribik and I that our department was corrupt and that we all take the side of the Grubb family during any dispute. He kept using profanity toward Sgt. Hribik and I and toward our entire department. Several times while speaking to Bob Ansell he stopped and told Bill to go back in the house. At one point he got so angry that he told me that the next police call was going to be on him fighting with Bill. I asked him to not antagonize an already volatile situation and to try to keep his brother under control.

Doc. No. 78-15. The report referred to the incident as an alleged "trespassing." *Id.*

On the evening of January 22, 2009, Officers Robert Zegar ("Zegar") and David J. Young ("Young") issued citations to Ansell for illegally parking two of his vehicles on Fairley Road. Doc. No. 94, ¶ 51. During meetings conducted by the Board on February 9, 2009, and February 23, 2009, Ansell complained that members of the RTPD had been treating him unfairly. Doc. No. 14, ¶¶ 47-48; Doc. No. 94, ¶¶ 54-55. On March 21, 2009, Officer Joseph LaMonica ("LaMonica") issued citations to Ansell for parking two of his vehicles in the wrong direction. Doc. No. 14, ¶ 49(a). The citations were voided after Robert complained to RTPD personnel on Ansell's behalf. *Id.* A police report later prepared by LaMonica stated that the citations had been voided because Fairley Road was "not wide enough for two-way traffic." Doc. 14-9, 1.

Officer Mark Wuycheck ("Wuycheck") cited Ansell for "illegal parking" on April 9, 2009. Doc. No. 14-10. Robert complained about Ordinance No. 2275 during a Board meeting conducted on April 13, 2009. Doc. No. 14, ¶ 50. After Robert was done speaking, Ansell described the problems that he had experienced with employees of Ross Township. *Id.*, ¶ 50.

Ross Township maintains a policy requiring the presence of a police officer at each Board meeting. Doc. No. 94, ¶ 98. Pursuant to that policy, Officer Matthew Grubb ("Grubb") attended a Board meeting conducted on May 11, 2009. *Id.*, ¶ 99. Ansell and Robert attended the

meeting as well. *Id.*, ¶ 101. Robert voiced complaints about Ansell's receipt of multiple parking citations, the location of the Grubbs' driveway, and alleged problems concerning the width of Fairley Road. *Id.*, ¶ 102. Robert presented photographs depicting his driveway being blocked by a vehicle owned by individuals who were visiting the Grubb residence. Doc. No. 14-16. Daniel DeMarco ("DeMarco"), the Chairman of the Board, attempted to address a different topic after the conclusion of Robert's remarks. Doc. No. 94, ¶¶ 105-106. Ansell interjected and asked, "You really don't get it, do you?" *Id.*, ¶ 107. DeMarco responded to Ansell's question by admonishing that the Board did not want to entertain additional arguments about the situation on Fairley Road and directing Grubb to remove Ansell from the meeting. *Id.*, ¶¶ 108-110. Grubb proceeded to escort Ansell out of the meeting room. *Id.*, ¶ 113. The relevant portion of the Board's meeting minutes stated as follows:

> Mr. Robert Ansell addressed the Board and presented photos of his driveway being blocked by a vehicle that was visiting the Grubb residence. Mr. Ansell discussed the relocation of the Grubb driveway. The no-parking zone was discussed. Commissioner Eyster stated it is a police matter and not something that the Board can legislate. Before addressing the Board, Commissioner DeMarco requested Mr. Ansell be removed, since nothing new was being addressed. Before being escorted out, Mr. William Ansell questioned whether he was being denied the right to discuss the large Opiela political signs throughout the township.

Doc. No. 14-16. Ansell was apparently removed from the meeting pursuant to a policy permitting the ejection of disruptive individuals. Doc. No. 94, ¶ 117.

Ansell received seven parking citations between May 16, 2009, and June 27, 2009. Doc. No. 14, ¶ 53(a). In a police report dated July 29, 2009, White stated that a vehicle owned by Ansell was partially blocking a neighbor's driveway. *Id.*, ¶ 53(b). Robert visited the headquarters of the RTPD that same day to obtain copies of several police reports. *Id.* Ralph C. Freedman ("Freedman"), Ross Township's Chief of Police, encountered Robert and informed

him that Ansell's vehicle was going to be towed out of the way. *Id.* After speaking with Robert about the matter, Freedman agreed to give Ansell twenty-four hours to voluntarily move the vehicle. Doc. No. 94, ¶ 65.

On September 29, 2009, a resident of Fairley Road contacted the RTPD and reported that Ansell's car alarm had been activated. *Id.*, ¶ 66. Officer M.P. Thomas ("Thomas") responded to the call. *Id.* Ansell was able to deactivate the alarm before Thomas' arrival. *Id.*, ¶ 67. After viewing the location of the vehicle, Thomas issued a citation to Ansell for parking his car more than twelve inches from the edge of the curb on Fairley Road. *Id.*, ¶ 68. The portion of the citation describing Ansell's offense stated that his car had been parked sixteen inches from the curb. Doc. No. 14-22.

Ansell commenced this action against Ross Township, Allegheny County, Grubb, Freedman, Orsino, White, Wuycheck, Chuberko, Zegar, LaMonica, Garcia, DeMarco, Castellano, Officer Joseph J. Serowik ("Serowik"), Officer Donald C. Sypolt, IV ("Sypolt"), Officer Barry Clifford ("Clifford"), and Warden Ramon C. Rustin ("Rustin") on October 16, 2009, alleging violations of the First, Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1985(3), and the common law of Pennsylvania respecting the torts of assault, battery, malicious prosecution, and intentional infliction of emotional distress. Doc. No. 1. On December 6, 2009, Ansell amended his complaint to add Fourth Amendment claims for excessive force and name Longo, Stokes, George and Deputy James Stegena ("Stegena") as additional defendants. Doc. No. 14. The deputies responded on January 8, 2010, by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. No. 18. In support of their motion to dismiss, the deputies argued that they were entitled to qualified immunity. Doc. No. 19. Although Ansell generally contested the motion to dismiss, he consented to the

dismissal of his § 1985(3) claims against the deputies.  Doc. No. 25.  The Court dismissed the §

1985(3) claims against the deputies without prejudice in a memorandum opinion and order dated

January 20, 2010.  Doc. No. 26.  The motion to dismiss was denied in all other respects.  *Id.*

Since the Court's decision denying the deputies' motion to dismiss implicated their

immunity from suit and rested on questions of law, it was subject to immediate appeal.  *Behrens*

*v. Pelletier*, 516 U.S. 299, 310-311, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).  The deputies

appealed the decision to the United States Court of Appeals for the Third Circuit on February 1,

2010.  Doc. No. 31.  On March 25, 2011, the Court of Appeals affirmed this Court's decision

denying the motion to dismiss.  *Ansell v. Ross Township*, 419 Fed.Appx. 209 (3d Cir.

2011)(unpublished).

Longo, Stokes, George and Stegena moved for summary judgment on January 2, 2012.

Doc. No. 66.  Ross Township and DeMarco filed a separate motion for summary judgment that

same day.  Doc. No. 68.  The remaining defendants filed two motions for summary judgment one

day later.  One motion was filed by Allegheny County and Rustin.  Doc. No. 70.  The other

motion was filed by Ross Township, Grubb, Freedman, Orsino, White, Wuycheck, Chuberko,

Zegar, LaMonica, Garcia, Serowik, Sypolt and Clifford.  Doc. No. 74.  The four motions for

summary judgment filed by the Defendants are the subject of this memorandum opinion.

## III.  Standard of Review

Summary judgment may only be granted where the moving party shows that there is no

genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED.

R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary

judgment against a party who fails to make a showing sufficient to establish an element essential

to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007).  The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact.  *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof.  *Celotex Corp.*, 477 U.S. at 322.  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial.  *Id.* at 324.  The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

IV.     **Jurisdiction and Venue**

Jurisdiction over Ansell's claims is predicated on 28 U.S.C. §§ 1331 and 1367(a).  Venue is proper under 28 U.S.C. § 1391(b).

V.      **Discussion**

Ansell brings his federal constitutional claims pursuant to 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. This remedial statute does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right. *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

As the United States Supreme Court observed in *Imbler v. Pachtman*, 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), "§ 1983 is to be read in harmony with general principles of tort immunities rather than in derogation of them." Consequently, the "qualified immunity" that was available to executive officials at common law may be invoked by executive officials sued under § 1983. *Hafer v. Melo*, 502 U.S. 21, 28-29, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). State officials performing discretionary duties are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In order for a federal right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity is not only a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

For this reason, the Supreme Court has often "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(*per curiam*).

Ansell asserts a myriad of claims against twenty-one different defendants. Doc. No. 14. Most of the individual defendants named in the amended complaint raise the defense of qualified immunity in support of their motions for summary judgment. Doc. No. 67, 15-17; Doc. No. 71, 13-16; Doc. No. 75, 10, 13-14. The Court has discretion to consider whether certain defendants are entitled to qualified immunity without determining whether the claims asserted against them would otherwise warrant relief. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

In the amended complaint, Ansell avers that, on November 15, 2007, Castellano used a leaf blower to blow leaves and dirt into his face. Doc. No. 14, ¶ 117. Ansell alleges that Castellano took this action in retaliation for complaints that he had voiced against the DPW. *Id.* Castellano's alleged act of blowing leaves and dirt into Ansell's face form the basis of both federal constitutional claims grounded in the First and Fourteenth Amendments and state tort claims premised on assault and battery theories. *Id.*, ¶¶ 73-93, 110-121. Unlike the other twenty defendants, Castellano has not moved for summary judgment.

Ansell alleges that Longo, Stokes, George and Stegena violated the Fourth and Fourteenth Amendments by using excessive force while effectuating his arrest on October 18, 2007. *Id.*, ¶¶ 175-184. He also brings supplemental assault and battery claims against the deputies based on their conduct during the arrest. *Id.*, ¶¶ 110-121. Ansell apparently believes that Allegheny County is vicariously liable under Pennsylvania law for the assaults and batteries allegedly committed by the deputies. *Id.* He asserts similar claims against Castellano and Ross

14

Township.  *Id.*  Since Castellano has not moved for summary judgment, the Court need only

consider Ansell's assault and battery claims in relation to the actions taken by Longo, Stokes,

George and Stegena.

### A.     The Fourth Amendment Claims Asserted Against the Deputies

The first step in considering a claim brought under § 1983 is to "identify the exact

contours of the underlying right said to have been violated."  *County of Sacramento v. Lewis*,

523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  The Fourth Amendment to

the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the persons or things to be
> seized.

U.S. CONST., AMEND. IV.  The proscriptions contained in the Fourth Amendment are applicable

to the States by virtue of the Fourteenth Amendment's Due Process Clause.  *Cady v.*

*Dombrowski*, 413 U.S. 433, 440, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

A person is "seized" within the meaning of the Fourth Amendment when the government

terminates his or her freedom of movement through means intentionally applied.  *Brower v.*

*County of Inyo*, 489 U.S. 593, 596-597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).  It is

undisputed that Ansell was "seized" when the deputies took him into custody.  *Pitchford v.*

*Borough of Munhall*, 631 F.Supp.2d 636, 645 (W.D.Pa. 2007).  Once it is determined that a

"seizure" has occurred, the legality of that seizure under the Fourth Amendment turns on

whether it was "reasonable."  *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).  In this case,

Ansell does not challenge the legality of the decision to arrest him.  He acknowledges that the

arresting officers executed a valid arrest warrant.  Doc. No. 94, ¶ 73; Doc. No. 77-3, 7.  The

"reasonableness" of a seizure, however, depends not only on whether or when it occurs, but also on "how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Ansell alleges that the deputies used "excessive force" (*i.e.*, an "unreasonable" degree of force) in making the arrest. Doc. No. 14, ¶¶ 175-184.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Any use of force "must be justified by the need for the specific level of force employed." *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010). "Force is reasonable only when exercised in proportion to the threat posed." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). In any case involving a constitutional challenge to an officer's use of force during the course of an arrest, the relevant question is whether the particular type of force employed was "reasonable" in light of "the precise circumstances confronted by the arresting officer." *Ickes v. Borough of Bedford*, 807 F.Supp.2d 306, 322 (W.D.Pa. 2011). "This question must be considered from the perspective of an objectively reasonable officer at the scene of the arrest." *Id.* The inquiry does not account for the arresting officer's subjective "intent or motivation." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).

The Supreme Court explained in *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that the "proper application" of the Fourth Amendment's standard of objective reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest or attempting to evade arrest by flight." In *Scott v. Harris*, 550 U.S. 372, 384, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court observed that the "relative

culpability" of the parties involved in a confrontation may also have some bearing on the "reasonableness" of the degree of force employed to effectuate an arrest. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397. A court presented with an excessive force claim grounded in the Fourth Amendment must account for the fact that an officer does not have "the benefit of hindsight" when he or she attempts to make an arrest. *Wargo v. Municipality of Monroeville*, 646 F.Supp.2d 777, 785 (W.D.Pa. 2009). The "totality of the circumstances" must be considered. *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007).

During the depositions conducted in connection with this case, the parties provided conflicting accounts of the arrest. Ansell testified that one of the deputies had "grabbed" him "by the leg" and pulled him off of his bed. Doc. No. 77-6, 14. He stated that the deputies had dragged him into a nearby hallway after pulling him onto the floor. *Id.*, 15. Longo testified that he, Stokes and Orsino had entered Ansell's bedroom and found him "crouched down in front of his bed on the floor." Doc. No. 80-5, 4. He denied that Ansell had been "dragged" out of the bedroom. *Id.*, 7. Stokes testified that Ansell had been lying on the floor in a "fetal position" at the time of the officers' entry. Doc. No. 80-19, 4. He stated that Ansell had "walked" out of the bedroom after the arrest. *Id.*, 5. Stokes attributed the actual arrest to Longo. *Id.* He denied that he had touched Ansell during the encounter. *Id.* George apparently entered the residence after learning that Ansell had been taken into custody. Doc. No. 80-16, 3. Ansell's handcuffs were briefly removed so that he could put on a shirt. Doc. No. 80-17, 1. Stegena waited outside and never entered Ansell's residence. Doc. No. 80-7, 3.

Although Longo and Stokes denied that Ansell had been dragged off of his bed and into the hallway, the Court must credit Ansell's testimony in the present context. *Thompson v. Wagner*, 631 F.Supp.2d 664, 678 (W.D.Pa. 2008). Even if it is assumed that Longo or Stokes used the degree of "force" described by Ansell to effectuate the arrest, the manner in which the "seizure" was carried out did not render it violative of the Fourth Amendment. It is undisputed that Ansell had a revolver hanging from his bedpost when the arresting officers arrived. Doc. No. 94, ¶ 78. Orsino testified that he had "secured" the revolver while Longo and Stokes were making the arrest. Doc. No. 79-2, 19. Longo testified that Orsino had discovered the revolver and verbally exclaimed "Gun" before Ansell had been taken into custody.[10] Doc. No. 80-5, 7. The presence of a firearm within Ansell's reach provided the arresting officers with a "reasonable" justification for dragging him off of his bed and into the hallway. *Graham*, 490 U.S. at 396 (explaining that the use of force to make an arrest may be objectively reasonable where the person being placed under arrest "poses an immediate threat to the safety of the officers or others").

Ansell posits that no amount of force was needed because he was not actively resisting arrest. Doc. No. 88, 7-8. Stokes responded in the negative when asked whether Ansell had attempted to evade capture. Doc. No. 80-19, 5. Stokes' testimony, however, must be read in context. Longo and Stokes both testified that they had repeatedly knocked on Ansell's front door before entering the residence, and that Ansell had been nonresponsive. Doc. No. 80-5, 3; Doc. No. 80-19, 3. They entered the residence through a garage door after retrieving the necessary

---

[10] Ansell mischaracterizes Longo's testimony by contending that, by Longo's own account, he had already been placed in handcuffs when Orsino first saw the revolver. Doc. No. 88, 7. Although Longo's initial description of the arrest left some doubt as to when the revolver had been discovered, he later clarified that Orsino had verbally exclaimed "Gun" *before* he and Stokes had taken Ansell into custody. Doc. No. 80-5, 7. Interestingly, Ansell acknowledges that he was not placed in handcuffs until after he had already been taken into the kitchen. Doc. No. 94, ¶ 187.

remote control device from Ansell's vehicle.  Doc. No. 80-5, 3.  Longo testified that Ansell's failure to answer the door had placed the approaching officers in a "threatening position."  *Id.*, 5. He stated that the officers had run across "hunting clothing and equipment," including "shotgun-type shells," while proceeding through Ansell's basement.  *Id.*, 4.  Stokes' account of the incident did not contradict this portion of Longo's testimony.  The testimonial evidence relied upon by Ansell supports only the proposition that he had not been resistant to the arrest *after* his first encounter with the officers.  Doc. No. 80-19, 5.

Ansell's failure to answer the door has some bearing on the reasonableness of the subsequent actions taken by the arresting officers.  *Scott*, 550 U.S. at 384 ("We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability.").  Had Ansell answered his door in a timely manner, there would have been no need for the arresting officers to enter his residence and expose themselves to the associated dangers.  Ansell testified that he suffered from an auditory impairment, and that he had not been wearing hearing aids on the morning of the arrest.  Doc. No. 77-6, 3.  To the extent that Ansell believes that his alleged inability to hear the officers knocking on the door weighs against the reasonableness of the officers' subsequent actions, he is mistaken.  The record contains no evidence suggesting that Orsino, Longo or Stokes knew that Ansell had hearing difficulties. Since the arresting officers did not know that Ansell's failure to come to the door was attributable to a medical condition, it was objectively reasonable for them to assume that he was consciously attempting to evade arrest.  *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011).

The Court acknowledges that Ansell was not arrested for a violent or serious crime.  This factor weighs in his favor to some extent.  *Graham*, 490 U.S. at 396 (recognizing "the severity of

the crime at issue" as a factor relevant to whether the force employed to make an arrest is objectively reasonable). Under the present circumstances, however, the minor nature of Ansell's offense (*i.e.*, his failure to appear for a scheduled compliance hearing) does not undermine the reasonableness of the actions taken by the arresting officers. "A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee." *Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009). It cannot be doubted that the officers faced a threat to their safety when they were executing the warrant for Ansell's arrest. Ansell acknowledges that a revolver was hanging from his bedpost when the officers entered the bedroom. Doc. No. 94, ¶ 78. By his own admission, he was not placed in handcuffs until after Longo and Stokes had already escorted him into the kitchen. Doc. No. 77-6, 16-17. The "force" alleged by Ansell (*i.e.*, the deputies' alleged act of dragging him off of the bed and into the hallway) clearly preceded the point at which his ability to threaten the safety of the officers had dissipated.

Consideration must also be given to the "nature and extent" of the force employed by the deputies. *Cyrus*, 624 F.3d at 861. The degree of force used to effectuate Ansell's arrest was minimal.[11] Ansell sustained no serious injuries as a result of the arrest. He testified that the deputies' alleged act of dragging him had caused him to suffer only minimal discomfort in his buttocks. Doc. No. 77-7, 5. Ansell never sought treatment for this "injury." *Id.* Indeed, he did not even request an over-the-counter pain reliever. *Id.* The fact that Ansell sustained no serious injuries weighs heavily against his assertion that the degree of force employed by the arresting officers was "excessive." *Orem v. Rephann*, 523 F.3d 442, 447-448 (4th Cir. 2008).

---

[11] The Court notes that when Ansell filed his original complaint in this action, he did not name the deputies as defendants or allege that the "force" employed during the arrest had been unreasonable. Doc. No. 1.

For the foregoing reasons, the actions taken by the deputies to effectuate Ansell's arrest were objectively reasonable as a matter of law. Allegations pertaining to the subjective intentions or motivations of the deputies are not germane to the Fourth Amendment inquiry. *Whren v. United States*, 517 U.S. 806, 812-813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Since the actions of Longo, Stokes, George and Stegena were not violative of the Fourth Amendment to begin with, it follows *a fortiori* that they did not violate a "clearly established" constitutional right enjoyed by Ansell. *Brosseau v. Haugen*, 543 U.S. 194, 198-201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)(*per curiam*). The Fourth Amendment claims asserted against the deputies will be dismissed.

**B.      The Claims Asserted Against the Deputies Under Pennsylvania Law**

An individual commits the tort of battery when he or she intentionally inflicts a "harmful or offensive contact" with another person's body. *C.C.H. v. Philadelphia Phillies, Inc.*, 940 A.2d 336, 340, n. 4 (Pa. 2008). An individual commits the tort of assault when he or she acts to cause an actual battery or to place another person in "imminent apprehension" of a battery, thereby causing the person to be "put in such imminent apprehension." *Jackson v. Pennsylvania Board of Probation & Parole*, 885 A.2d 598, 601, n. 2 (Pa.Commw.Ct. 2005), quoting the *Restatement (Second) of Torts* § 21 (1965). Ansell brings assault and battery claims against Longo, Stokes, George and Stegena. Doc. No. 14, ¶¶ 110-116. He apparently believes that Allegheny County is vicariously liable for the deputies' actions. *Id.*

Pennsylvania's Crimes Code provides that a police officer attempting to make an arrest "is justified in the use of any force which he [or she] believes to be necessary to effect the arrest and of any force which he or she believes to be necessary to defend himself [or herself] or another from bodily harm while making the arrest." 18 PA. CONS. STAT. § 508(a)(1). The

Pennsylvania Supreme Court has recognized that the language of the Crimes Code can sometimes "be used to set the legal parameters for establishing both criminal and civil liability." *C.C.H.*, 940 A.2d at 343. The deputies rely on their statutory arrest power, including their authority to use force in making an arrest, to defeat Ansell's assault and battery claims. Doc. No. 67, 13.

Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA") [42 PA. CONS. STAT. § 8541 *et seq.*] provides, in pertinent part, that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[12] 42 PA. CONS. STAT. § 8541. An employee of a local agency[13] is generally shielded from liability for actions taken "within the scope of his [or her] office or duties" to "the same extent as his [or her] employing local agency." 42 PA. CONS. STAT. § 8545. Such an employee is also entitled to the defense of "official immunity" if he or she can demonstrate that the conduct giving rise to a claim "was authorized or required by law, or that he [or she] in good faith reasonably believed [that] the conduct was authorized or required by law." 42 PA. CONS. STAT. § 8546(2). A plaintiff can overcome an employee's statutory immunity by demonstrating that his or her tortious conduct "constituted a crime, actual fraud, actual malice or willful misconduct." 42 PA. CONS. STAT. § 8550.

The Court has already concluded that the actions taken by the deputies were objectively reasonable for purposes of the Fourth Amendment. That determination is not dispositive of Ansell's assault and battery claims, since the standards applicable under the Fourth Amendment do not mirror those applicable under state law. *Virginia v. Moore*, 553 U.S. 164, 168-176, 128

---

[12] This statutory provision is subject to specific exceptions that are not germane to the Court's analysis in this case. 42 PA. CONS. STAT. § 8542.

[13] The term "local agency" is defined broadly enough to include Allegheny County. 42 PA. CONS. STAT. § 8501. The deputies are "employees" of Allegheny County. *Id.*

S.Ct. 1598, 170 L.Ed.2d 559 (2008). A State is free to provide its inhabitants with statutory protections extending beyond those contained in the United States Constitution. *Id.* Nonetheless, the record in the present case provides no support for Ansell's assertion that the deputies committed actionable assaults or batteries while taking him into custody.

The Pennsylvania Supreme Court articulated the test applicable to assault and battery claims asserted against arresting officers in *Renk v. City of Pittsburgh*, 641 A.2d 289 (1994). Speaking through Justice Zappalla, the Pennsylvania Supreme Court explained:

> A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is necessary under the circumstances to effectuate the arrest. The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery.

*Renk*, 641 A.2d at 293. The Pennsylvania Supreme Court further declared that "[a] police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest is unnecessary or excessive." *Id.* It was further noted that an officer who intentionally uses "excessive force" while making an arrest engages in "willful misconduct" for purposes of the PSTCA. *Id.* at 293-294.

Ansell concedes that the arresting officers had probable cause to take him into custody.[14] Doc. No. 94, ¶ 73. It is undisputed that the arrest was carried out pursuant to a valid arrest warrant. The limited degree of force employed by the deputies was "believe[d] to be necessary to effect the arrest" and, therefore, "authorized or required by law." 18 PA. CONS. STAT. § 508(a)(1); 42 PA. CONS. STAT. § 8546(2). Because the degree of force used in this case was no more invasive of Ansell's interests than necessary to assure the safety of the arresting officers, no

---

[14] A police officer who arrests an individual without probable cause is liable for false imprisonment under Pennsylvania law. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293-294 (Pa. 1994).

reasonable trier of fact could conclude that the deputies committed assaults or batteries that would be actionable under the present circumstances.

Ansell testified that one of the deputies had "shoved" his head into a corner while Orsino was searching his bedroom in order to prevent him from observing the search.  Doc. No. 77-6, 17.  Ansell's handcuffs were briefly removed so that he could put on a shirt.  Doc. No. 77-7, 2.  He stated that George had threatened to "shoot" him if he were to make any threatening moves while the handcuffs were being removed.  *Id.*  George acknowledged that he had warned Ansell not to "make a move" before removing the handcuffs.  Doc. No. 80-17, 1.  The conduct alleged by Ansell, however, was reasonably designed to protect the safety of the officers.  Ansell testified that he had been held in the corner *before* being placed in handcuffs.  Doc. No. 77-6, 16.  The handcuffs were not applied until after he had been escorted into the kitchen.  *Id.*  Since the revolver had been discovered in Ansell's bedroom, the deputies had a reasonable basis for preventing him from watching Orsino's search.  There is nothing in the record which suggests that Ansell's head was pushed into the corner in a violent manner.  Ansell merely testified that his face had made contact with the wall.  *Id.*, 17.  It is undisputed that no injuries resulted from this incident.  George's warning to Ansell was clearly designed to prevent the need for further force.  Since the actions taken by the officers were reasonably calculated to effectuate the arrest in a manner which assured both their own safety and that of Ansell, the record provides no basis for a finding that the officers committed actionable assaults or batteries while taking Ansell into custody.  *Renk*, 641 A.2d at 293-294.

The amended complaint alleges that all defendants named in this action, including the deputies, committed the tort of intentional infliction of emotional distress.  Doc. No. 14, ¶¶ 170-174.  In order to recover damages under such a theory, a plaintiff must show that he or she

suffered "severe emotional distress" because of "outrageous or extreme conduct" engaged in by a defendant. *Reedy v. Evanson*, 615 F.3d 197, 232 (3d Cir. 2010). Conduct may fairly be characterized as "outrageous or extreme" only if it is so "outrageous in character" and "extreme in degree" that it goes "beyond all possible bounds of decency" and must be regarded as "utterly intolerable in civilized society." *Swisher v. Pitz*, 868 A.2d 1228, 1230-1231 (Pa.Super.Ct. 2005). A plaintiff must also demonstrate that he or she suffered "physical injury or harm" as a result of the defendant's conduct. *Fewell v. Besner*, 664 A.2d 577, 582 (Pa.Super.Ct. 1995).

Ansell's intentional infliction of emotional distress claims against the deputies necessarily fail because no showing of "outrageous or extreme" conduct can be made under the circumstances surrounding the arrest. Moreover, Ansell testified that he had never sought treatment for physical or mental injuries stemming from the events alleged in the amended complaint. Doc. No. 77-4, 6-7. A plaintiff seeking to recover damages under a theory of intentional infliction of emotional distress must provide "expert medical confirmation" that he or she "actually suffered the claimed distress." *Kazatsky v. King David Memorial Park*, 527 A.2d 988, 995 (Pa. 1987). Nothing in the record suggests that the emotional distress alleged by Ansell manifested itself in "physical injury or harm." *Fewell*, 664 A.2d at 582. Consequently, he cannot recover from any of the defendants under this theory. *Reedy*, 615 F.3d at 232.

The motion for summary judgment filed by Longo, Stokes, George and Stegena will be granted in its entirety. Doc. No. 66. These four defendants will be dismissed as parties to this case. Given that no actions taken by the deputies in relation to Ansell are actionable under Pennsylvania law, the vicarious liability claims based on those actions must also be dismissed. *Kraus v. Taylor*, 710 A.2d 1142, 1147 (Pa.Super.Ct. 1998). Since Ansell never sought medical treatment in connection with the events surrounding this case, all defendants named in the

amended complaint are entitled to summary judgment with respect to his intentional infliction of emotional distress claims. *Kazatsky*, 527 A.2d at 995.

C.      **The Unreasonable Search Claim**

The Fourth Amendment provides protection against "unreasonable searches and seizures." U.S. CONST., AMEND. IV. An arrest is constitutionally "reasonable" only when it is made on the basis of "probable cause."[15] *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). In this case, it is undisputed that Ansell was taken into custody pursuant to a valid arrest warrant. Doc. No. 94, ¶ 73. Nevertheless, Ansell alleges that Orsino violated his right to be free from "unreasonable searches" by conducting a limited search of his bedroom without procuring a search warrant. Doc. No. 14, ¶¶ 122-128.

Warrantless searches that do not fall within "a few specifically established and well-delineated exceptions" are "*per se* unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)(emphasis in original). "Among the exceptions to the warrant requirement is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). This exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.* In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court explained:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items

---

[15] "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995).

must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less.

*Chimel*, 395 U.S. at 762-763. The "scope of a search incident to arrest" must be "commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Gant*, 556 U.S. at 339. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Id.*

The interest that law enforcement officers have in protecting themselves from harm sometimes justifies warrantless searches for persons other than the individual who is arrested. In *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court held that officers arresting an individual inside of his or her home may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." "If the search goes beyond the immediately adjoining areas, there must be 'articulable facts' which would warrant a reasonably prudent officer to believe that there are individuals who pose a danger in other areas of the house." *Sharrar v. Felsing*, 128 F.3d 810, 822-823 (3d Cir. 1997).

Ansell testified that while the deputies were holding him in the corner of the hallway, he could see Orsino looking in his dresser and closet. Doc. No. 77-3, 4-7. Orsino acknowledged that he had checked Ansell's nightstand in order to ensure that "there were no other weapons in the immediate area." Doc. No. 79-1, 13. By that time, the revolver had already been secured. *Id.*, 11. Orsino stated that his primary concern had been to ensure that no weapons would be accessible to Ansell in the event that he was able to break free from the deputies' grasp. *Id.*, 15; Doc. No. 79-3, 2-3. As noted earlier, Ansell testified that the handcuffs had not been applied until after his entry into the kitchen. Doc. No. 77-6, 16. Thus, he was not in handcuffs when he saw Orsino searching the bedroom. When asked about the matter during his deposition, Orsino could not recall whether he had looked inside of Ansell's closet. Doc. No. 79-1, 15. Orsino explained that he may have done so for the purpose of ensuring that nobody else was in the room. *Id.*

The undisputed evidence of record indicates that Orsino looked only "in closets and other spaces immediately adjoining the place of arrest." *Buie*, 494 U.S. at 334. This search was conducted after a deadly firearm had already been discovered inside of Ansell's bedroom. The actions taken by Orsino were clearly commensurate with the purpose of protecting the arresting officers. *Gant*, 556 U.S. at 339. On the basis of the existing record, Ansell cannot establish that Orsino violated his Fourth Amendment right to be free from "unreasonable searches." Since no violation can be established in any event, it is even more clear that Ansell cannot overcome Orsino's entitlement to qualified immunity. *Pearson*, 555 U.S. at 243-245.

Ansell attempts to proceed against Orsino in both his personal and official capacities. Doc. No. 14, ¶¶ 122-128. A plaintiff bringing a personal-capacity claim against an official seeks to hold the official personally liable for his or her conduct. *Kentucky v. Graham*, 473 U.S. 159,

165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). An award of money damages entered against a personal-capacity defendant can be executed only against his or her "personal assets." *Id.* at 166. A personal-capacity defendant may rely on personal defenses or immunities that are not available to governmental entities. *Id.* at 166-167. In contrast, an official-capacity action brought against a public official is essentially the same as an action brought directly against the governmental entity of which he or she is an agent. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). When an official-capacity defendant leaves office, his or her successor is "automatically substituted as a party to the litigation" by operation of law. FED. R. CIV. P. 25(d). An award of damages entered against an official-capacity defendant can be executed only against the employing governmental entity, since "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166. The only immunities available to a defendant sued in his or her official capacity are those available to the governmental entity itself. *Hafer*, 502 U.S. at 25.

Since Ansell cannot establish that Orsino violated his Fourth Amendment rights, his claim against Ross Township (*i.e.*, his official-capacity claim against Orsino) is not viable. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)(*per curiam*). Even if it is assumed that Orsino violated Ansell's constitutional rights by conducting the search, Ansell still cannot proceed against Ross Township under the present circumstances. Unlike Orsino, Ross Township cannot raise the defense of qualified immunity. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)(holding that a governmental entity "may not assert the good faith of its officers or agents as a defense to liability under § 1983"). Nonetheless, a governmental entity cannot be held vicariously liable under § 1983 for constitutional violations perpetrated by its agents or employees. *Berg v. County*

29

*of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000). A plaintiff may recover damages from a governmental entity only where his or her constitutional injuries are caused by the execution of the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Ansell makes no attempt to explain why he believes that Orsino conducted the search pursuant to a "policy or custom" of Ross Township. Doc. No. 93, 12-13. Indeed, he does not even *allege* that Orsino acted in accordance with such a "policy or custom." Doc. No. 14, ¶¶ 122-128. Consequently, Ansell's official-capacity claim must be dismissed even if Orsino's conduct was violative of the Fourth Amendment.

### D.    The "Unreasonable" Strip Search Claims

Ansell testified that he had been subjected to two "strip searches" after arriving at the County Jail. Doc. No. 77-11, 5-8. He stated that the first search had occurred inside of a curtained cubicle and in the presence of a male corrections officer. *Id.*, 6. Ansell explained that during the search, he had been required to remove his clothes, spread the cheeks of his buttocks, and lift his scrotum before donning a "red jump suit." *Id.*, 5-6. He claimed that the curtain to the cubicle had been partially open during the search, allowing others to see him naked. *Id.*, 6. Ansell further asserted that he had subsequently been forced to disrobe and shower in an area with no curtains. *Id.*, 8-9. A male corrections official was apparently present while Ansell was showering. *Id.*, 8.

The parties apparently disagree as to whether these searches constituted "strip searches" or "visual body inspections." Doc. No. 94, ¶ 329. The nomenclature used to define the searches, however, has no bearing on whether they were constitutional. *Safford Unified School District #1 v. Redding*, 557 U.S. 364, ___, 129 S.Ct. 2633, 2641, 174 L.Ed.2d 354 (2009). Regardless of

how the searches are characterized, the dispositive question is whether they were "unreasonable" within the meaning of the Fourth Amendment. *Id.*

Ansell alleges that corrections officials violated his Fourth Amendment right to be free from "unreasonable searches" by strip searching him without "reasonable suspicion to believe that [he was] concealing a weapon or contraband." Doc. No. 14, ¶ 139. In *Florence v. Board of Chosen Freeholders of the County of Burlington*, 621 F.3d 296, 298, 311 (3d Cir. 2010), the United States Court of Appeals for the Third Circuit held that it was "reasonable" for "jails to strip search arrestees upon their admission to the general [prison] population." The searches at issue in *Florence* were factually similar to those described by Ansell. *Florence*, 621 F.3d at 299. Consequently, Ansell has no constitutional basis for challenging the *justification* for the searches.

Even when a strip search is constitutionally justified, a corrections official may not "conduct the search in an abusive fashion." *Bell*, 441 U.S. at 560. The Fourth Amendment requires that all such searches "be conducted in a reasonable manner." *Id.* Ansell testified that no corrections officers had touched him during the strip searches. Doc. No. 77-11, 6. Therefore, this case does not involve an allegation of sexual or physical abuse, which could render an otherwise permissible strip search unconstitutional. *Watson v. Secretary of Pennsylvania Department of Corrections*, 436 Fed.Appx. 131, 136 (3d Cir. 2011)(unpublished).

In the amended complaint, Ansell alleges that "female inmates and arrestees passing through the area" were able to view his naked body during the first strip search because the corrections officer conducting the search "did not close the curtains" of the cubicle. Doc. No. 14, ¶ 149. He testified that during the search, his naked body had been visible to "everybody" who was standing near the cubicle. Doc. No. 77-11, 6. Despite the precise nature of the allegations contained in the amended complaint, it is not clear from Ansell's testimony whether

he was strip searched in the presence of women. Such an allegation could conceivably provide a basis for determining that the search was carried out in an "unreasonable" manner.[16] *Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995)(remarking that prisoners "retain a limited constitutional right to bodily privacy, particularly as to searches viewed or conducted by members of the opposite sex"). Under the present circumstances, however, the Court has no occasion to confront that issue.

The corrections officials who strip searched Ansell are not named as defendants in this action. The Fourth Amendment claims relating to the strip searches are directed only at Rustin and Allegheny County. Doc. No. 14, ¶¶ 137-160. An official sued under § 1983 may be held personally liable only "for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Rustin's status as the Warden of the County Jail cannot serve as a basis for holding him liable for injuries attributable to the alleged misconduct of his subordinates. *Evancho v. Fisher*, 423 F.3d 347, 353-354 (3d Cir. 2005). Liability under § 1983 cannot be premised on a theory of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). In order to proceed with his personal-capacity claim against Rustin, Ansell must demonstrate that Rustin was *personally* involved in the alleged decision to conduct the strip search in the presence of female inmates. *Id.* Furthermore, Ansell cannot proceed against Allegheny County under § 1983 without establishing that his constitutional injuries were "caused by a municipal policy or custom." *Los Angeles County v. Humphries*, ___U.S.___, ___, 131 S.Ct. 447, 449, 178 L.Ed.2d 460 (2010). In this context, Allegheny County cannot be held liable solely because it employed the individuals allegedly responsible for violating Ansell's

---

[16] Even if it is assumed that a prisoner's right to bodily privacy is subordinate to a State's interest in offering employment opportunities to prison guards of both sexes on an equal basis, it does not necessarily follow that a prisoner may be strip searched in the presence of *inmates* of the opposite sex. *Johnson v. Pennsylvania Bureau of Corrections*, 661 F.Supp. 425, 432 (W.D.Pa. 1987)(recognizing a need "to balance the competing concerns of maximizing the female guards' employment opportunities and deference to inmate privacy").

Fourth Amendment rights. *Collins v. City of Harker Heights*, 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

David Hungerman ("Hungerman") has been employed as the administrator of the County Jail's "intake system" since June 2007. Doc. No. 80-35, 5. Although Hungerman had no specific knowledge of the circumstances surrounding Ansell's strip search, he testified that men and women did not normally "intermingle" in areas where strip searches were being conducted. Doc. No. 80-37, 9. Hungerman stated that no females should have been present while Ansell was being searched. *Id.*

Even if it is assumed that Ansell was strip searched in the presence of female inmates, he cannot establish that a policy or custom implemented by Rustin or Allegheny County caused the strip search to be carried out in such an "unreasonable" manner. Indeed, he does not even *allege* that the County Jail had a policy or custom of strip searching arrestees in mixed-gender settings. His averments concerning the policies promulgated by Rustin and Allegheny County pertain only to the fact that all arrestees entering the County Jail were strip searched, regardless of the nature of their offenses or the level of suspicion as to whether they were concealing weapons or contraband. Doc. No. 14, ¶¶ 139-144, 153-156. To the extent that Ansell believes that the County Jail had no *justification* for conducting the strip searches in the first place, his position is foreclosed by *Florence*. *Florence*, 621 F.3d at 311. For these reasons, the motion for summary judgment filed by Rustin and Allegheny County will be granted in its entirety. Doc. No. 70.

The Court of Appeals' decision in *Florence* is presently being reviewed by the Supreme Court. A writ of certiorari was granted in the case on April 4, 2011. *Florence v. Board of Chosen Freeholders of the County of Burlington*, ___U.S.___, 131 S.Ct. 1816, 179 L.Ed.2d 772 (2011). Although Rustin will most likely be shielded by qualified immunity irrespective of

whether the Court of Appeals' decision is reversed, a governmental entity such as Allegheny County "may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen*, 445 U.S. at 638 (footnote omitted). Consequently, the viability of Ansell's Fourth Amendment claim against Allegheny County may turn on the Supreme Court's impending decision in *Florence*. In fairness to Ansell, the Court will dismiss his claims relating to the strip searches *without prejudice*. If the correctness of this Court's decision is undermined by the Supreme Court's decision, Ansell can move for the reinstatement of his Fourth Amendment claims against both Rustin and Allegheny County.

### E.   The Conspiracy Claims Under 42 U.S.C. § 1985(3)

Ansell alleges that all defendants other than the deputies conspired to violate his rights under the Equal Protection Clause of the Fourteenth Amendment.[17] Doc. No. 14, ¶¶ 94-109. His conspiracy claims are based on 42 U.S.C. § 1985(3), which provides:

> **(3) Depriving persons of rights or privileges.** If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

---

[17] Although Ansell initially asserted conspiracy claims against the deputies, those claims were subsequently dismissed with his consent. Doc. No. 25, 2, n. 1; Doc. No. 26.

42 U.S.C. § 1985(3). This statutory provision does not create substantive rights. *Great American Savings & Loan Association v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Instead, it provides a remedy for those who suffer violations of the rights designated therein. *Id.*

Unlike § 1983, § 1985(3) does not contain an "under color" of law element. *Griffin v. Breckenridge*, 403 U.S. 88, 92-101, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Consequently, a plaintiff proceeding under § 1985(3) need not establish the existence of state action if the underlying right that he or she seeks to vindicate is assertable against private entities. *Id.* at 104-107. Where the actionable federal right underlying the conspiracy is assertable only against governmental entities, a plaintiff cannot prevail under § 1985(3) without demonstrating the existence of the governmental action necessary to establish a violation of that right. *United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

The jurisprudence governing the application of § 1985(3) can be traced to *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In *Griffin*, the Supreme Court declared that § 1985(3) was never "intended to apply to all tortious, conspiratorial interferences with the rights of others." *Griffin*, 403 U.S. at 101. Speaking through Justice Stewart, the Supreme Court explained:

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by law to all.

*Id.* at 102 (emphasis in original; footnotes omitted). Since its decision in *Griffin*, the Supreme Court has never recognized a nonracial class as a class entitled to statutory protection under §

1985(3). *Scott*, 463 U.S. at 836. The United States Court of Appeals for the Third Circuit has recognized women and mentally retarded individuals as statutorily-protected classes. *Farber v. City of Paterson*, 440 F.3d 131, 137 (3d Cir. 2006). A plaintiff bringing a conspiracy claim under § 1985(3) "must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." *Id.* at 135.

Ansell does not allege that his constitutional rights were violated because of his membership in a particular class. Instead, he contends that members of the RTPD conspired against him because of his "outspoken and public criticism of Ross Township officers, employees, and agents." Doc. No. 14, ¶ 98. This contention, however, does not provide Ansell with a basis for proceeding under § 1985(3). In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), the Supreme Court made the following observations:

> Whatever may be the precise meaning of a "class" for purposes of *Griffin*'s speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with. This definitional ploy would convert the statute into the "general font of tort law" it was the very purpose of the animus requirement to avoid.

*Bray*, 506 U.S. at 269. Relying on *Bray*, the Court of Appeals has determined that "§ 1985(3) does not provide a cause of action for individuals allegedly injured by conspiracies motivated by discriminatory animus directed toward their political affiliation." *Farber*, 440 F.3d at 143. Because Ansell's conspiracy claims are predicated solely on animus allegedly attributable to his criticism of Ross Township officials, all of his claims under § 1985(3) must be dismissed.

**F.     The Malicious Prosecution Claim Asserted Against Garcia**

On October 9, 2008, Ansell and Randi each contacted the RTPD and accused the other of illegally blocking Fairley Road.  Doc. No. 90, ¶ 40.  Garcia responded to the calls and arrived at the scene.  *Id.*, ¶ 41.  He cited Ansell for driving on the wrong side of a roadway after discussing the matter with him, Randi, and another resident of Fairley Road.  Doc. No. 78-13, 1.  In a police report describing the incident, Garcia stated as follows:

> Caller states the residents at 106 Fairley have the road blocked with their cars and he is unable to get through.  He states this is an ongoing problem.  1753: Resident of 106 Fairley called to report that the resident at 109 Fairley is blocking the road.
>
> Upon arrival, I viewed a H2 Hummer sitting in the opposite lane blocking traffic from proceeding.  A verbal dispute occurred between the residence [sic] of 109 Fairley Dr [sic] (William Ansell) and 106 Fairley Dr. (Randi Grubb) [sic] The dispute was over Mrs. Grubb blocking the roadway and not allowing Mr. Ansell from proceeding.  Upon speaking with witnesses, it was determined that Mr. Ansell failed to yield to oncoming traffic when he attempted to proceed around a parked car.  He then parked his car in the roadway and called 911.  Mr. Ansell will be cited for driving on the wrong side of a roadway (3301a2).

*Id.*  The statutory provision referenced in Garcia's police report provides that, "[u]pon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway except . . . [w]hen an obstruction exists making it necessary to drive to the left of the center of the roadway, provided the driver yields the right-of-way to all vehicles travelling in the proper direction upon the unobstructed portion of the roadway within such distance as to constitute a hazard."  75 PA. CONS. STAT. § 3301(a)(2).

Ansell contested the citation issued by Garcia.  After a trial conducted before District Justice Richard J. Opiela on January 5, 2009, Ansell was found "guilty."  Doc. No. 14-2, 3.  Ansell appealed his conviction to the Court of Common Pleas of Allegheny County on January 30, 2009.  *Id.*  The appeal provided him with an opportunity for a trial *de novo*.  PA. R. CRIM. P.

462.  The trial, which was conducted before Judge Robert C. Gallo on April 7, 2009, resulted in Ansell's acquittal.  Doc. No. 14-2, 4.

In the amended complaint, Ansell alleges that Garcia issued the citation "without probable cause" and "with malice."  Doc. No. 14, ¶¶ 130, 133-134.  He contends that Garcia is liable for malicious prosecution under Pennsylvania law.  Doc. No. 93, 11-12.  In order to hold Garcia liable for malicious prosecution, Ansell must demonstrate that Garcia instituted criminal proceedings against him "without probable cause" and "with malice," and that the proceedings were ultimately terminated in his favor.  *McKibben v. Schmotzer*, 700 A.2d 484, 492 (Pa.Super.Ct. 1997).  In this context, "probable cause" is defined as "a reasonable ground of suspicion" supported by circumstances sufficient to warrant an objectively prudent person in the same situation to believe that the individual against whom proceedings are brought is guilty of the charged offense.  *Kelley v. General Teamsters, Chauffeurs, & Helpers, Local Union 249*, 544 A.2d 940, 942 (Pa. 1988).

Relying on *Cosmas v. Bloomingdales Bros., Inc.*, 660 A.2d 83 (Pa.Super.Ct. 1995), Garcia argues that Ansell's initial conviction precludes his malicious prosecution claim even though his subsequent appeal ultimately resulted in an acquittal.  Doc. No. 75, 5-6.  In *Cosmas*, the Pennsylvania Superior Court stated that an overturned conviction continues to operate as "conclusive proof of the existence of probable cause" in a subsequent action for malicious prosecution "unless the convicted party can show fraud or other undue influences at work in the conviction proceedings."  *Cosmas*, 660 A.2d at 86 (footnote omitted).  The language in *Cosmas* relied upon by Garcia, however, is not consistent with the Superior Court's earlier decision in *Cap v. K-Mart Discount Stores, Inc.*, 515 A.2d 52, 54 (Pa.Super.Ct. 1986).  The United States Court of Appeals for the Third Circuit has recognized the inconsistency between *Cosmas* and

*Cap. Mosley v. Wilson*, 102 F.3d 85, 92-94 (3d Cir. 1996). In light of this inconsistency, the extent to which Ansell's initial conviction precludes him from litigating the issue of probable cause in this action presents an unsettled question of Pennsylvania law.

There is no need for the Court to determine whether the conviction serves as "conclusive proof of the existence of probable cause" in the present context. *Cosmas*, 660 A.2d at 86. Even if it is assumed that Ansell can litigate the issue of probable cause in this case, he has an affirmative obligation to *prove* that Garcia lacked probable cause to issue the citation. *Johnson v. Land Title Bank & Trust Co.*, 198 A. 23, 24 (Pa. 1938). Although a lack of probable cause can sometimes be proven by reference to circumstantial evidence, it cannot be inferred simply because the charge at issue ultimately resulted in an acquittal. *Miller v. Pennsylvania Railroad Co.*, 89 A.2d 809, 811-812 (Pa. 1952); *Jones v. MacConochie*, 56 A.2d 284, 286 (Pa.Super.Ct. 1948). Ansell points to nothing in the record which suggests that Garcia did not have probable cause to issue the citation. Instead, he simply asserts that the issue of probable cause in this case "rests entirely on the credibility of witnesses." Doc. No. 93, 11. This assertion appears to be based on the alleged falsity of the information provided to Garcia by Ansell's neighbors. The existence or nonexistence of probable cause, however, does not turn on the underlying question of guilt or innocence. *McMillan v. First National Bank of Berwick*, 978 A.2d 370, 372, n. 1 (Pa.Super.Ct. 2009). If Ansell wishes to premise his malicious prosecution claim on the theory that the information provided by his neighbors was false, he must demonstrate that Garcia either *knew* or *should have known* the information to be false. *Wagner v. Waitleverich*, 774 A.2d 1247, 1253 (Pa.Super.Ct. 2001). He cannot surmount this hurdle simply by establishing the falsity of that information. *Id.* ("Probable cause may even be based upon erroneous information if at the time of the arrest, a reasonable officer would not have known of the error.").

In order to proceed with his malicious prosecution claim, Ansell must also establish that Garcia acted with "malice." *Miller*, 89 A.2d at 813. "Malice" exists where a defendant acts on the basis of "hatred or ill will," or where his or her actions "evidence a 'reckless and oppressive disregard [for] the plaintiff's rights.'" *Doherty v. Haverford Township*, 513 F.Supp.2d 399, 409 (E.D.Pa. 2007), quoting *Hugee v. Pennsylvania Railroad Co.*, 101 A.2d 740, 743 (Pa. 1954). Although Ansell makes reference to hostile statements made by Freedman during a Board meeting conducted on August 11, 2008, he does not explain how those statements relate to Garcia's issuance of the citation two months later. Doc. No. 93, 11. Under certain circumstances, malice can be inferred from an officer's decision to initiate criminal charges in the absence of probable cause. *Hugee*, 101 A.2d at 743. In this case, however, Ansell cannot establish that probable cause was lacking. Therefore, Garcia is entitled to summary judgment with respect to Ansell's malicious prosecution claim.

In the amended complaint, Ansell names Garcia in both his personal and official capacities. Doc. No. 14, ¶¶ 129-136. As discussed earlier, an official-capacity action brought against an official is the same as an action brought against the governmental entity that employs him or her. *Graham*, 473 U.S. at 166. Given that Ansell cannot establish that Garcia committed an actionable violation of Pennsylvania law, it follows *a fortiori* that Ross Township cannot be held vicariously liable for such a violation.[18] *Kraus*, 710 A.2d at 1147.

## G. The Claims Relating to the Board Meeting Conducted on May 11, 2009

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to

---

[18] The PSTCA would have most likely immunized Ross Township from Ansell's official-capacity claim even if Garcia had committed an actionable violation of Pennsylvania law. 42 PA. CONS. STAT. §§ 8541-8542; *Parsons v. City of Philadelphia Coordinating Office of Drug & Alcohol Abuse Programs*, 833 F.Supp. 1108, 1118-1119 (E.D.Pa. 1993).

assemble, and to petition the Government for a redress of grievances." U.S. CONST., AMEND. I. The proscriptions contained in the First Amendment are applicable to state actors by virtue of the Due Process Clause of the Fourteenth Amendment. *Schlarp v. Dern*, 610 F.Supp.2d 450, 457 (W.D.Pa. 2009). Ansell alleges that his First and Fourteenth Amendment rights were violated when he was ejected from the Board meeting conducted on May 11, 2009. Doc. No. 14, ¶¶ 55-72.

The Board meeting constituted a "limited public forum."[19] *Galena v. Leone*, 638 F.3d 186, 199 (3d Cir. 2011). In *Good News Club v. Milford Central School*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), the Supreme Court articulated the constitutional standards applicable to a limited public forum by stating as follows:

> When the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified "in reserving [its forum] for certain groups or for the discussion of certain topics." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829, 132 L.Ed.2d 700, 115 S.Ct. 2510 (1995); see also *Lamb's Chapel [v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 392-393, 124 L.Ed.2d 352, 113 S.Ct. 2141 (1993)]. The State's power to restrict speech, however, is not without limits. The restriction must not discriminate against speech on the basis of viewpoint, *Rosenberger, supra,* at 829, and the restriction must be "reasonable in light of the purpose served by the forum," *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806, 87 L.Ed.2d 567, 105 S.Ct. 3439 (1985).

*Good News Club*, 533 U.S. at 106-107. Because the meeting constituted a limited public forum, the Board was free to limit the discussion conducted at the meeting to "issues germane to town government." *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004). Even in a limited public forum, however, a governmental entity may not engage in "an effort to suppress

---

[19] "[T]he government's intent in creating the forum, as well as the extent of the permissible use by the public within the forum, determines the designation of the type of forum." *Galena v. Leone*, 638 F.3d 186, 201 (3d Cir. 2011). There is no need for an exhaustive discussion concerning the proper characterization of the forum in this case, since the meeting's classification as a "limited public forum" does not appear to be disputed by the parties. Doc. No. 69, 6; Doc. No. 86, 2-8.

expression merely because public officials oppose the speaker's view." *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

In an affidavit dated December 28, 2011, DeMarco provided the following description of his decision to eject Ansell from the meeting:

> The May 11, 2009, meeting of the Board of Commissioners was a regular business meeting. At regular business meetings the Board of Commissioners reviews and votes on all agenda items. Mr. Robert Ansell, the brother of William Ansell, spoke for a period exceeding five (5) minutes. Most of what he said had been said by either he or William Ansell at prior public meetings and private meetings with other Township officials. After he completed his speech, I moved the agenda to another matter, thereby ending the petitions and complaints portion of the meeting. William Ansell then made a disruptive comment from the audience. I told him that he was not going to speak because he was not speaking about any new issues that had not been raised by him or Robert before. He continued to act in a disruptive manner and I asked a police officer to escort him from the room in order to maintain decorum and continue the meeting.

Doc. No. 80-32, 3, ¶ 6. DeMarco argues that he ejected Ansell solely to "ensure order" at the meeting. Doc. No. 69, 7. In support of his position, he relies on a statutory provision permitting an entity such as the Board to adopt "the rules and regulations necessary for the conduct of its meetings and the maintenance of order." 65 Pa. Cons. Stat. § 710.

In the setting presently at issue, a government "may restrict the time, place and manner of speech, as long as those restrictions are reasonable and serve the purpose for which the government created the limited public forum." *Galena*, 638 F.3d at 199. A viewpoint-neutral decision by DeMarco to enforce a rule designed to maintain order at the meeting would not constitute a violation of the First Amendment. *Eichenlaub*, 385 F.3d at 281 (explaining that a presiding officer "would impinge on the First Amendment rights of other would-be participants" if he or she were "to allow a speaker to try to hijack the proceedings, or to filibuster them"). The

critical factual issue is whether DeMarco acted only to maintain order, or whether Ansell's "viewpoint *or identity*" was the motivating factor behind DeMarco's decision. *Galena*, 638 F.3d at 202 (emphasis added).

The record contains declarations submitted by Ansell and Robert. In his declaration, Ansell stated that he had not been disruptive at the meeting, and that DeMarco had "ignored" him while he was standing at a podium and waiting for a chance to speak. Doc. No. 84-1, ¶ 18. Robert provided a similar description of the incident. Doc. No. 84-2, ¶ 6. Viewing the evidence in the light most favorable to Ansell, the Court assumes that he was standing at the podium and calmly waiting for a chance to speak when DeMarco ordered his removal. *Thompson*, 631 F.Supp.2d at 678.

The instant factual issue can only be understood by reference to the transcript of the meeting. At the meeting, the following colloquy occurred:

MR. ROBERT ANSELL:     You have the right to put the street back to the width it's supposed to be at. I've got a survey. I showed you a survey with a 20-foot wide street. Why is the street only 16 ½ feet directly across from our driveway? It's not something I did. It's not something my brother did. It's something that the people that live there was done from the people that they got the home from. It's illegal.

COMMISSIONER DeMARCO:     Okay. The time is up. I have given you a little extra time including comments made by commissioners. Your time is up.

MR. ROBERT ANSELL:     I have got his minutes?

COMMISSIONER DeMARCO:     No. You're next. Just say what you want to say, please.

MR. ROBERT ANSELL:     Exactly what we have said. What are you going to do about it?

COMMISSIONER DeMARCO:     You know what, Mr. Ansell? I'm going to say you're asking the same questions you've asked over and over and over.

MR. ROBERT ANSELL:     You know what?  You're an attorney.  If you ask a question 100 times and you don't get an answer, I'm going to ask it a couple hundred more times, because you're not answering the problem.  What is the problem?  The problem is the street is screwed up there.  I didn't cause it.

COMMISSIONER DeMARCO:     Mr. Ansell, you have asked the question.  Different commissioners, including your commissioner, they have tried to help.  They've tried to answer, given you answers.

MR. ROBERT ANSELL:     Answer the stuff I want.  I want action.

COMMISSIONER DeMARCO:     The answer you want—

MR. ROBERT ANSELL:     I want action.

COMMISSIONER DeMARCO:     You're not getting the answer you want.  That's what it boils down to.  You're not receiving the answer—that is the problem here.

MR. ROBERT ANSELL:     What answer are you giving me?

COMMISSIONER DeMARCO:     You want an answer that is going to make you happy and to make your neighbors, the Grubbs, unhappy.  That's what this has been about all along.

MR. ROBERT ANSELL:     I didn't start the fight.  I didn't start the fight.

COMMISSIONER DeMARCO:     Do you understand if you criticize me, you criticize this Board?

MR. ROBERT ANSELL:     If you want me—

COMMISSIONER DeMARCO:     That's quite unfair.

MR. ROBERT ANSELL:     If you want to run me out—

COMMISSIONER DeMARCO:     You're done.

MR. ROBERT ANSELL:     I'll be back here in two weeks.

THE COURT:[20]     Thank you very much.

MR. ROBERT ANSELL:     Lana, I'll be on the phone with you and Chris; and we'll find out what can be done.  Thank you.

---

[20] It is not clear who made this statement.

COMMISSIONER DeMARCO:     Okay.  Next on the agenda, resolutions to be adopted, Resolution No. 1977.

MR. WILLIAM ANSELL:     You don't really get it, do you?

COMMISSIONER DeMARCO:     Mr. Ansell, we're done.  Officer, could you please remove Mr. Ansell?

MR. WILLIAM ANSELL:     Did I get my five minutes?

COMMISSIONER DeMARCO:     No.  I said you're done, because we are not talking about anything new.  We're talking about the same thing over and over.  And I'm asking Officer Grubb to remove you, because we are talking about the same thing.

MR. WILLIAM ANSELL:     I got something new.

COMMISSIONER DeMARCO:     Officer Grubb, please remove Mr. Ansell.  Thank you.

MR WILLIAM ANSELL:     Are you denying me the right to talk about those big ridiculous Opiela signs all over the township?

COMMISSIONER DeMARCO:     Please, just leave.

Doc. No. 79-5, 7-11.  Given that DeMarco arguably appeared to be offended by Robert's criticism of the Board immediately before terminating his comments, it should be determined by a jury whether DeMarco's true motivation for ejecting Ansell from the meeting was to suppress Ansell's viewpoint.  *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404-405 (3d Cir. 2006).  This creates a genuine issue of material fact which could be suggestive of a motive to silence a particular message or viewpoint and which could allow a reasonable jury to conclude that Ansell's First Amendment rights were violated when he was ejected from the meeting.  *Galena*, 638 F.3d at 205-213 (finding insufficient evidence of an impermissible motive in a case in which a speaker had been ejected by an official who had no knowledge of the speaker's viewpoint or perspective before choosing to remove him).

"The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).  Even in a limited public forum, viewpoint-based discrimination is presumed to be impermissible when it is "directed against speech otherwise within the forum's limitations."  *Id.* at 830.  The fact that Ansell and Robert were permitted to discuss the situation concerning Fairley Road on previous occasions precludes a determination that Ansell's anticipated comments were not "germane to town government."  *Eichenlaub*, 385 F.3d at 281. Admittedly, the Board was not required to give Ansell unlimited amounts of time to repeatedly articulate the same arguments again and again.  *Id.*  In this instance, however, Ansell was not only silenced, but also *removed*.  This apparently occurred just as Ansell was preparing to speak. The transcript indicates that DeMarco asked Grubb to eject Ansell in response to a single question.  Doc. No. 79-5, 10.  DeMarco stated that Ansell was being removed from the meeting *because* he and his brother had been "talking about the same thing over and over."  *Id.*  The minutes of the meeting stated that Ansell had been removed because "nothing new was being addressed."  Doc. No. 14-16.  Nothing in the transcript or minutes of the meeting confirms DeMarco's contention that Ansell was being disruptive.  On the basis of the existing record, the Court cannot conclude as a matter of law that DeMarco ordered Ansell's removal from the meeting for the sole purpose of maintaining order, and without reference to his "opinion or perspective."  *Rosenberger*, 515 U.S. at 829.

It remains to be determined whether DeMarco is entitled to qualified immunity.  In *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit recognized that "clearly established" law requires a public official

to "conform [his or] her conduct to the requirements of the First Amendment" when acting to eject a speaker from a public meeting. The Court of Appeals went on to state that "[i]n cases in which a constitutional violation depends on evidence of a specific intent, 'it can never be objectively reasonable for a government official to act with the intent that is prohibited by law.'" *Monteiro*, 436 F.3d at 404, quoting *Locurto v. Safir*, 264 F.3d 154, 169 (2d Cir. 2001). It was further noted that "[m]otive is a question of fact that must be decided by a jury, which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor." *Monteiro*, 436 F.3d at 405. The holding in *Monteiro* is directly on point and dispositive of DeMarco's motion for summary judgment. Since a reasonable trier of fact could conclude that DeMarco ordered Ansell's removal on the basis of an impermissible motive, DeMarco's motion for summary judgment must be denied.

Ansell also alleges that Grubb violated his First Amendment rights by removing him from the meeting at DeMarco's request. Doc. No. 14, ¶¶ 55-72. This claim is highly problematic. DeMarco's potential liability for ordering Ansell's removal from the meeting is based on an alleged improper motive. *Monteiro*, 436 F.3d at 404-405. Ansell points to nothing in the record which suggests that Grubb shared DeMarco's motivation for the ejection. Doc. No. 86, 2-8. In order for official conduct to be actionable in this context, a plaintiff must show that his or her constitutionally protected activities were a "substantial" or "motivating factor" behind that conduct.[21] *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 285-287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Suppan v. Dadonna*, 203 F.3d 228, 235-237 (3d Cir. 2000). Robert Bellan ("Bellan"), Ross Township's most recent Chief of Police, testified that

---

[21] In the event that a plaintiff is able to surmount this hurdle, the defendant can nevertheless defeat the claim by showing, by a preponderance of the evidence, that he or she would have taken the same action in relation to the plaintiff even if the plaintiff had not engaged in activities entitled to First Amendment protection. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 285-287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Grubb had been under an obligation to follow DeMarco's instructions.  Doc. No. 78-26, 14-15.

Since this testimony is uncontradicted, no reasonable trier of fact could conclude other than that

Grubb ejected Ansell from the meeting *solely* because DeMarco had asked him to do so.  For this

reason, Ansell's First Amendment claim against Grubb must be dismissed.[22]

Ansell alleges that his removal from the meeting constituted a violation of his Fourth

Amendment rights.  Doc. No. 14, ¶¶ 161-169.  This allegation is based on the idea that he was

unreasonably "seized" when Grubb escorted him from the meeting.  *Id.*, ¶¶ 164, 167.  Under the

present circumstances, however, Ansell's claims are not viable.  The Supreme Court has defined

the term "seizure" as "a governmental termination of [an individual's] freedom of movement

through means intentionally applied."  *Brower*, 489 U.S. at 597 (emphasis omitted).  Nothing in

the record suggests that Ansell's "freedom of movement" was impeded by his ejection from the

meeting.  Ansell cannot establish the existence of a "seizure" merely by showing that Grubb

made contact with his body during the encounter.  *Mellott v. Heemer*, 161 F.3d 117, 124-125 (3d

Cir. 1998).  "A seizure occurs whenever a police officer restrains a person's freedom and

prevents him or her from walking away."  *Gale v. Storti*, 608 F.Supp.2d 629, 633 (E.D.Pa. 2009).

Since Ansell's ejection from the meeting did not inhibit his ability to move freely, he was not

"seized" within the meaning of the Fourth Amendment.  *Id.* (explaining that a plaintiff could not

establish that he was "seized" simply by showing that "he did not want to leave the premises, but

was forced to").  Consequently, the Court will dismiss all of Ansell's Fourth Amendment claims

---

[22] At a minimum, Grubb is entitled to qualified immunity.  *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)(remarking that the standard for determining whether a defendant is entitled to qualified immunity "gives ample room for mistaken judgments").

based on the actions taken by DeMarco and Grubb at the meeting.[23]  Grubb will be dismissed as a party to this case.

Given that Ansell's First Amendment claim against DeMarco must proceed to trial, the Court must determine whether his concomitant claim against Ross Township should likewise proceed to trial.  A governmental entity such as Ross Township cannot be held liable under § 1983 for injuries "inflicted solely by its employees or agents."  *Monell*, 436 U.S. at 694.  Instead, a local government may be held liable under § 1983 only for violations of federal rights resulting from the "execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Id.*

Ross Township argues that Ansell's First Amendment claim must be dismissed because DeMarco's decision to remove Ansell from the meeting was an isolated incident and did not involve "widespread" conduct.  Doc. No. 69, 10-12.  The tenor of this argument suggests that Ross Township misunderstands the inquiry required under *Monell*.  A local governing body is clearly liable under § 1983 for constitutional injuries caused by the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  *Board of County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).  It is only in the latter case that a practice must be "widespread" to result in a finding of municipal liability.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)(remarking that "where action is directed by those who

---

[23] Since DeMarco and Grubb did not violate Ansell's Fourth Amendment rights, Ansell's Fourth Amendment claim against Ross Township must be dismissed.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)(*per curiam*).

establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly").

In *Board of County Commissioners v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court made the following observations about when a municipal entity can be held liable under § 1983:

> As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.
> Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. *Daniels v. Williams*, 474 U.S. 327, 330, 88 L.Ed.2d 662, 106 S.Ct. 662 (1986). In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Brown*, 520 U.S. at 404-405 (emphasis in original). Ross Township does not deny that DeMarco acted as its "authorized decisionmaker" when he asked Grubb to remove Ansell from the meeting. Bellan testified that Grubb had been under a duty to follow DeMarco's order requiring Ansell's removal. Doc. No. 78-26, 14-15. In light of DeMarco's status as Ross Township's "authorized decisionmaker," a determination that he intentionally violated Ansell's First Amendment rights would necessitate a finding that Ross Township itself "acted culpably." *Brown*, 520 U.S. at 405. Therefore, Ross Township's motion for summary judgment will be

denied with respect to the First Amendment claim stemming from Ansell's ejection from the Board meeting.[24]  *Schlegel v. Craft*, Civil Action No. 03-268, 2005 WL 1949551, at *2-3, 2005 U.S. Dist. LEXIS 16798, at *4-10 (W.D.Ky. Aug. 11, 2005)(denying a municipality's motion for summary judgment where the plaintiff was able to produce evidence suggesting that he had been removed from a public meeting at the behest of the "presiding officer").

### H.    The First Amendment Retaliation Claims Asserted Against RTPD Members

Ansell's First Amendment claims against Freedman, White, Wuycheck, Chuberko, Zegar, LaMonica, Garcia, Serowik, Sypolt and Clifford are premised on the multiple parking citations that Ansell received.  Doc. No. 14, ¶ 87.  Ansell alleges that the citations were issued in retaliation for statements made by him at several Board meetings.  *Id.*, ¶ 82.  In order to establish that his First Amendment rights were violated by the issuance of the citations, Ansell must demonstrate that he engaged in expressive activities entitled to constitutional protection, and that those activities were a "substantial" or "motivating" factor behind the officers' respective decisions to issue the citations.[25]  *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006); *Eichenlaub*, 385 F.3d at 282.  There is no question that Ansell's activities were protected by the First Amendment.  *Thomas v. Collins*, 323 U.S. 516, 531, 65 S.Ct. 315, 89 L.Ed. 430 (1945)(describing the wide range of expressive activities entitled to First Amendment protection).  The defending officers challenge the viability of Ansell's claims only with respect to the issue of causation.  Doc. No. 75, 2-4.

---

[24] Ansell's official-capacity claim against DeMarco is duplicative of his claim against Ross Township.  *Malone v. Economy Borough Municipal Authority*, 669 F.Supp.2d 582, 604-605 (W.D.Pa. 2009).  Consequently, the Court considers the official-capacity claim against DeMarco and the claim against Ross Township to be the same claim. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)(explaining that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

[25] A defendant can defeat a retaliation claim grounded in the First Amendment by establishing that he or she would have taken the same action in relation to the plaintiff even in the absence of the plaintiff's protected activities. *Latessa v. New Jersey Racing Commission*, 113 F.3d 1313, 1319 (3d Cir. 1997).

During his deposition, Ansell consistently acknowledged that he had no specific evidence implicating individual members of the RTPD in efforts to punish him for statements that he had made to Ross Township officials.  Doc. No. 77-3, 10-14, 17; Doc. No. 77-4, 5.  The officers rely on Ansell's testimony in support of their motion for summary judgment.  Doc. No. 75, 2-4. Ansell contends that a jury could infer causation from the timing of the citations and the alleged "intervening period of antagonism."  Doc. No. 93, 4; *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).  He argues that only a finder of fact can determine whether his constitutionally protected activities were a "substantial" or "motivating" factor behind the police actions at issue.  Doc. No. 93, 1-9.

The Court acknowledges that an inference of causation or retaliatory motive can sometimes be drawn from circumstantial evidence.  *Merkle v. Upper Dublin School District*, 211 F.3d 782, 795 (3d Cir. 2000).  The problem with Ansell's argument, however, is that it ignores the typical factual predicate from which an inference of retaliation can be drawn.  Ansell does not contend that a single police officer engaged in a pattern of retaliatory harassment.  Instead, he claims that multiple officers issued citations to him in retaliation for his constitutionally protected activities.  In this context, each citation must be considered separately.  *O'Connor v. City of Newark*, 440 F.3d 125, 127-128 (3d Cir. 2006)("First Amendment retaliation claims are always individually actionable, even when relatively minor.").  In order to hold a particular officer liable for issuing a particular citation, Ansell must produce sufficient evidence to support a finding that the officer in question was actually aware of his complaints to Ross Township officials.  *Gorum v. Sessoms*, 561 F.3d 179, 188 (3d Cir. 2009).  The timing of a citation's issuance can constitute probative evidence of a retaliatory animus only where it is coupled with evidence suggesting that the officer responsible for issuing the citation actually knew about

Ansell's protected statements. *Ambrose v. Township of Robinson*, 303 F.3d 488, 494 (3d Cir. 2002)("The cases listed above found temporal proximity to be relevant in establishing that protected activity was a substantial or motivating factor for retaliation. None of these cases suggest that temporal proximity can be used to show that an employer was aware of the protected conduct in the first place.").

Ansell makes no attempt to establish that the officers who issued citations to him were aware of his expressive and petitioning activities. Although he contends that Wuycheck cited him for "illegal parking" on April 9, 2009, in retaliation for his acquittal in the Court of Common Pleas two days earlier, Ansell points to nothing in the record which suggests that Wuycheck was aware of the acquittal when the citation was issued. Doc. No. 93, 9. The First Amendment claims asserted against the officers cannot proceed to trial solely on the basis of speculation. The record indicates that Ansell has been involved in an ongoing dispute with his neighbors about the parking situation on Fairley Road. If the Court were to permit his claims to proceed simply on the basis of conjecture, he would be able to insulate himself from legitimate law enforcement actions by continuing to voice complaints. *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267-268 (3d Cir. 2007).

The Court acknowledges that an "otherwise legitimate and constitutional" act of law enforcement violates the First Amendment when it is undertaken for the purpose of retaliating against an individual for engaging in expressive activities. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). The members of the RTPD are not free to punish Ansell for his statements at Board meetings by citing him for violations that would normally be overlooked. Nevertheless, Ansell cannot proceed with First Amendment claims against ten different police officers based solely on the aggregate number of citations that he received during the relevant period of time.

*O'Connor*, 440 F.3d at 127-128.  If it were otherwise, many innocent police officers would be forced to "stand trial or face the other burdens of litigation" solely because some of their colleagues have engaged in unlawful forms of retaliation.  *Mitchell*, 472 U.S. at 526.  Given that Ansell points to no evidence which establishes that a particular citation was issued in retaliation for his complaints to Ross Township officials, summary judgment will be entered in favor of Freedman, White, Wuycheck, Chuberko, Zegar, LaMonica, Garcia, Serowik, Sypolt and Clifford.  These defendants will be dismissed as parties to this case.  Since Ansell cannot demonstrate that individual members of the RTPD violated his First Amendment rights by issuing the citations, the claims against Ross Township pertaining to those citations will likewise be dismissed.  *Heller*, 475 U.S. at 799.

## VI.    Conclusion

Since Castellano has not moved for summary judgment, the Court has no occasion to address the merits of the First Amendment, assault and battery claims asserted against him.  Doc. No. 14, ¶¶ 73-93, 110-121.  A genuine issue of material fact exists as to whether DeMarco ordered Ansell's removal from the Board meeting of May 11, 2009, for the purpose of suppressing his expressive and petitioning activities.  Therefore, the motion for summary judgment filed by DeMarco and Allegheny County (Doc. No. 68) will be denied with respect to the First Amendment claims pertaining to the meeting.  The motion will be granted in all other respects.  The motions for summary judgment filed by the deputies employed by Allegheny County (Doc. No. 66) and the police officers employed by the RTPD (Doc. No. 74) will be granted in their entirety.  The motion for summary judgment filed by Rustin and Allegheny County (Doc. No. 70) will likewise be granted, but the claims asserted against them will be dismissed without prejudice.  Allegheny County, Grubb, Freedman, Orsino, White, Wuycheck,

Chuberko, Zegar, LaMonica, Garcia, Serowik, Sypolt, Clifford, Rustin, Longo, Stokes, George and Stegena will be dismissed as parties to this case, and the caption will be amended accordingly.

s/ Arthur J. Schwab<br>
Arthur J. Schwab<br>
United States District Judge

cc:    All Registered ECF Counsel and Parties